UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X
JEWEL RANKINS and DARREN WONG,

                       Plaintiffs,

        -against-

OLD LYME GOURMET COMPANY,

                       Defendant.
----------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
20-CV-1756 (ENV) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

This is a putative class action brought against Old Lyme Gourmet Company ("Old Lyme"). (*See* Am. Compl., ECF No. 65, at 1.) Plaintiffs Jewel Rankins and Darren Wong purchased potato chips manufactured by Defendant Old Lyme Gourmet Company, doing business as Deep River Snacks, which had a graphic on the packaging that stated the chips contained non-GMO ingredients. (*Id.* ¶¶ 1, 23, 35.) Alleging that the graphic was misleading, Plaintiffs filed suit on behalf of all similarly situated purchasers. (*Id.*) Plaintiffs allege that Defendant Old Lyme violated numerous states' consumer protection statutes as well as the common law of Connecticut, the state where Defendant Old Lyme maintains its headquarters. (*Id.* ¶¶ 12, 16–21.)

Currently pending before the Court is Plaintiffs' motion for final settlement approval. For the following reasons, the Court recommends granting Plaintiffs' motion.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**I.  Factual Background**

Plaintiff Jewel Rankins is a Brooklyn resident. (Am. Compl., ECF No. 65, ¶ 22.) Plaintiff Darren Wong is a San Francisco, California resident. (*Id.* ¶ 34.) Defendant Old Lyme ("Defendant") is a domestic corporation and a wholly-owned subsidiary of Arca

Continental S.A.B. de C.V., a Mexican corporation. (*Id.* ¶¶ 46–48.) Rankins purchased Defendant's Aged Cheddar Horseradish flavored chips in Brooklyn in 2018, believing that they were "verified to be non-GMO by an independent third-party verifier." (*Id.* ¶¶ 23, 27.) Wong purchased Defendant's Aged Cheddar Horseradish and Sour Cream and Onion flavored chips in San Francisco in 2019 and 2020, believing that they were "verified to be non-GMO by an independent third-party verifier." (*Id.* ¶¶ 35, 39.) Rankins alleges that when given a choice, she "purposefully chooses non-GMO products . . . and relies on packaging representations to determine if products are certified as non-GMO by an independent, third-party verifier." (*Id.* ¶ 24.) Likewise, Plaintiff Wong alleges that he "relied on the Non GMO Ingredients Seal . . . and would not have purchased the Product had [he] known the Non GMO Ingredients representation was deceptive." (*Id.* ¶ 39.) Both Plaintiffs claim that if they had known the chips they bought were not verified by an independent third party, they would not have been willing to pay the same amount for the chips or would not have purchased them at all. (*Id.* ¶¶ 27, 29–30, 41.)

Plaintiffs also allege that "consumers have become significantly more aware of, and sensitive to, products that have been approved by independent third parties, and they buy those products based upon the seals of the independent third parties." (*Id.* ¶ 6.) According to Plaintiffs, "many consumers try to buy products that are not derived from GMOs," which in turn, has produced "an industry of independent, third-party validation companies" to meet such demand. (*Id.* ¶¶ 7–8.) One such third party is the Non-GMO Project, a nonprofit that runs a "Verification Program" to certify that "products are not derived from GMO crops" or "animals that were fed GMO crops." (*Id.* ¶¶ 13–14.) Products that meet the Non-GMO Project's standards receive permission to place a seal on the front of the approved product's packaging:





(*Id.* ¶¶ 15–17.)[1] In this case, Plaintiffs claim that Defendant "intentionally mimicked the appearance of an independent verifier's seal, such as the seal of the Non-GMO Project," when formulating its own emblem:

---

[1] For the sake of clarity, the Court takes judicial notice of, and includes here, the entirety of the Non-GMO Project seal, as depicted on the front of the product packaging included in Plaintiffs' complaint. (*See* Am. Compl., ECF No. 55-5, ¶¶ 16–17; Mem. in Supp. of Mot. to Dismiss, ECF No. 34, at 2; *id.* at 3 n.1.) *See also Gordon v. Target Corp.*, No. 20-CV-9589 (KMK), 2022 WL 836773, at *5 (S.D.N.Y. Mar. 18, 2022). The Court notes that the image included in Plaintiffs' complaint omitted the word "verified" and the website address of the Non-GMO Project. (Am. Compl., ECF No. 55-5, ¶ 16.)





(*Id.* ¶¶ 5, 10–12, 17.)

Further, Plaintiffs allege that Defendant created its non-GMO graphic "to profit off consumer desire for independently validated products," when in fact, Defendant's products do not meet the Non-GMO Project's standards for receiving such approval and verification. (*Id.* ¶¶ 16, 18–19 (noting that Defendant's products "contain dairy [] from cows fed GMO grains," whereas the Non-GMO Project "does not allow for its seal of approval to be placed on dairy-based products that could be from animals fed GMO feed").) Plaintiffs claim that Defendant's deceptive practices led consumers to pay "a

significant premium" for non-GMO products without receiving "the benefit of the bargain," i.e., "avoid[ing] the well-known health and environmental risks associated with GMO products." (*Id.* ¶ 20.)

## II. Procedural History

Plaintiff Rankins initiated this putative class action on April 9, 2020. (*See generally* Compl., ECF No. 1.) Following the parties' engagement in limited discovery and unsuccessful settlement negotiations, the Honorable Eric N. Vitaliano granted Defendant Old Lyme's motion for leave to file a motion to dismiss. (Aug. 23, 2021 ECF Order; *see also, e.g.*, July 27, 2021 Status Report, ECF No. 24 (summarizing procedural history).) Defendant Old Lyme filed its fully briefed motion to dismiss on December 7, 2021, which Judge Vitaliano thereafter referred to the undersigned Magistrate Judge for a report and recommendation. (*See* Mot. to Dismiss, ECF No. 32; Mem. in Opp'n to Mot. to Dismiss, ECF No. 33; Mem. in Supp. of Mot. to Dismiss, ECF No. 34; Reply in Supp. of Mot. to Dismiss, ECF No. 35; Dec. 8, 2021 ECF Order; *see also* Def.'s Suppl. Authority, ECF No. 36; Resp. to Def.'s Suppl. Authority, ECF No. 38.) On June 9, 2022, the Court issued a Report and Recommendation recommending that the motion to dismiss be granted as to Plaintiff Rankins's claims for breach of express warranty, unjust enrichment, and injunctive relief, and denied as to Plaintiff Rankins's various deceptive business practice and advertising claims. (R. & R., ECF No. 39.) Judge Vitaliano adopted the Report and Recommendation in full on August 15, 2023. (Mem. & Order, ECF No. 44.) Thereafter, Defendant answered the complaint and the parties began to engage in discovery. (Answer, ECF No. 48; Status Report, ECF No. 50.)

On March 12, 2024, the parties requested a stay of the discovery schedule for the purpose of engaging in formal mediation, which request was granted on March 13, 2024. (Joint Mot. to Stay, ECF No. 51; Mar. 13, 2024 ECF Order.) On April 30, 2024, the

parties reported that they had reached an agreement in principle on a class action settlement. (Mot. to Stay, ECF No. 52.) On July 1, 2024, Plaintiffs filed a motion for preliminary settlement approval and for leave to file an amended complaint. (Mot., ECF No. 56.) The motion was referred to the undersigned Magistrate Judge on July 2, 2024; following the referral, the Court scheduled a preliminary fairness hearing to take place on September 16, 2024. (July 2, 2024 Order Referring Mot.; July 12, 2024 Scheduling Order.)

The Court held a preliminary fairness hearing on September 16, 2024. (Sept. 16, 2024 ECF Min. Entry & Order; Prelim. Fairness Hr'g Tr., ECF No. 59.) The Court heard argument regarding Plaintiffs' pending motion, including the likelihood of final settlement approval and class certification, as well as the parties' proposed notice procedures. (*See generally* Prelim. Fairness Hr'g Tr., ECF No. 59.) The Court addressed Plaintiffs' request to file an amended complaint and confirmed that Defendant did not object to its filing for the limited purpose of entering into the proposed settlement. (*Id.* at 5:14–7:7.) The parties represented that the proposed settlement was reached following mediation, and the parties provided an overview of that process, including that the parties accepted the mediator's proposal. (*Id.* at 16:3–25, 17:13–19:17.) The parties also discussed the benefits of settlement and estimated that settlement would help the parties avoid two to four years of litigation and associated costs. (*Id.* at 19:18–24:18.) In addition, the Court requested that the parties correct various issues and typographical errors in the claim form and notice. (*Id.* at 46:9–63:9.)[2] The parties

_____

[2] Specifically, on the claim form, the Court indicated that the parties should make clear that proposed class members may request an unlimited number of claim awards with a proof of purchase for each product, and that it seemed unfair for otherwise valid claims to be rejected if

subsequently filed a revised Claim Form and Notice reflecting these corrections. (Revised Claim Form, ECF No. 57-1; Revised Long Form Notice, ECF No. 57-3.)

On October 30, 2024, the Court issued a Report and Recommendation on the motion for preliminary settlement approval and class certification. (R. & R., ECF No. 61.) There, the Court recommended (1) preliminarily certifying a settlement class (hereinafter the "Settlement Class"); (2) appointing Plaintiffs as the class representatives (hereinafter "Class Representatives"); (3) appointing Reese LLP and Sheehan & Associates as class counsel (hereinafter "Class Counsel" or "Plaintiffs' counsel"); (4) preliminarily certifying the settlement agreement; (5) approving the notice plan; (6) appointing Epiq Class Action & Claims Solutions ("Epiq") as settlement administrator and directing it to commence the notice plan; (7) scheduling a fairness hearing to consider final approval of the settlement; and (8) entering the revised Proposed Preliminary Approval Order. (*Id.* at 33–34.) The Court also recommended approving Plaintiffs' proposed amended complaint. (*Id.* at 7 n.3.)

On December 4, 2024, Judge Vitaliano adopted the October 30, 2024 Report and Recommendation in its entirety and, on December 6, 2024, he entered the preliminary approval order. (Dec. 4, 2024 ECF Order Adopting R. & R.; Order, ECF No. 64.) Judge Vitaliano also scheduled a final approval hearing for April 29, 2025, before the

---

there was a counting error or if the claim was inadvertently submitted twice. (Prelim. Fairness Hr'g Tr., ECF No. 59, at 46:9–50:4, 48:14–19.) As to the Notice, the Court inquired about how it described the issue in the case (*i.e.*, Defendant's use of the words "Non-GMO Ingredients" in connection with a graphical design as opposed to a plain textual statement), and the parties agreed it would be clearer to refer to Defendant's use of a non-GMO graphic or label. (*Id.* at 50:16–52:4.) In addition, the Court noted that it was not clear from the Notice who qualified as "released parties," and that the Notice must notify putative class members that they may represent themselves *pro se* and provide more detail for putative class members as to the anticipated expenses related to claim administration. (*Id.* at 52:23–63:9.)

undersigned Magistrate Judge. (Order, ECF No. 64; Dec. 6, 2024 ECF Order.) At the parties' request, the Court rescheduled the final approval hearing, which took place on May 15, 2025. (Consent Mot. to Adjourn Conference, ECF No. 66; Dec. 18, 2024 ECF Scheduling Order.)

On February 18, 2025, Plaintiffs filed a motion for attorney's fees. (Mot. for Atty's Fees, ECF No. 67; Mem. in Supp., ECF No. 67-1 (hereinafter "Fees Mem.").) On April 1, 2025, Plaintiffs filed a motion for final approval of the class action settlement. (Mot. for Final Approval, ECF No. 68; Mem. in Supp., ECF No. 68-1 (hereinafter "Final Approval Mem.").) On May 15, 2025, the undersigned Magistrate Judge held the final fairness hearing. (*See* May 15, 2025 Min. Entry & Order; Tr. of Final Fairness Hr'g (hereinafter "Hr'g Tr."), ECF No. 69.) On May 23, 2025, the parties filed a proposed final approval order and judgment. (Proposed Final Approval Order, ECF No. 70.) In addition, also on May 23, 2025, Class Counsel submitted their contemporaneous billing records for *ex parte* review. (*See* May 15, 2025 ECF Order; Hr'g Tr., ECF No. 69, at 38:7–24 (granting leave to submit billing records *ex parte*, on consent of defense counsel).)

For the reasons set forth below, the Court respectfully recommends granting (1) the motion for final settlement approval and (2) the motion for attorneys' fees and award to Plaintiffs. The Court further recommends entering the proposed final approval order.

## DISCUSSION

## I.  Settlement Agreement, Fund Allocation, and Notification to Class

The proposed settlement agreement defined the Settlement Class as:

[A]ll Persons who, from February 2, 2017 to the date of this Order, purchased one or more of the Products in the United States for personal or household use. Excluded from the Settlement Class and Settlement Class Members are: (a) the Released Parties; (b) all distributors, wholesalers, retailers, and licensors of the Products; (c) judges presiding over the

Actions and any members of their immediate families and/or staff; (d) Persons who made a valid, timely request for exclusion; (e) the mediator Jill Sperber; and (f) any government entity.

(Settl. Agr., ECF No. 55, ¶¶ 2.47, 2.12.)

According to the settlement agreement, each Settlement Class Member is entitled to a share of the settlement fund of $4,000,000 (hereinafter the "Settlement Fund"), less: (1) attorneys' fees with reasonable expenses to Class Counsel; (2) any award to Plaintiffs; (3) taxes due on interest earned by the settlement fund; and (4) the costs of the claims administration. (*Id.* ¶¶ 2.48, 3.7(c); *see also* Revised Long Form Notice, ECF No. 57-3, at 6.)

The settlement agreement provides that each "Class Member who submits a valid claim, with a proof of purchase, shall receive $5.00 for the first product claimed and $0.50 for each additional product claimed that is submitted with a proof of purchase," with no limit on the number of products claimed with proof of purchase, and that each "Class Member who submits a valid claim, without a proof of purchase, shall receive $5.00 for the first product claimed and $0.50 for each additional product claimed up to a maximum of ten (10) additional products claimed, for a total of $10.00." (Settl. Agr., ECF No. 55, ¶ 3.4(a)–(b) (cleaned up).) Plaintiffs note that all class members may obtain the same relief and are treated equally in the settlement agreement. (Final Approval Mem., ECF No. 68-1, at 8.)

In exchange for their share of the Settlement Fund, members of the settlement class release:

> [A]ny and all claims, demands, rights, suits, liabilities, and causes of action of every nature and description whatsoever, known or unknown, matured or unmatured, at law or in equity, existing under federal or state law, that any Plaintiff or Settlement Class Member has or may have against the Released Parties arising out of or related in any way to the transactions, occurrences, events, behaviors, conduct, practices, and policies alleged in, or that could have been alleged in the Actions,

including but not limited to those claims asserted in the Actions, the Rankins Complaint, the Wong Complaint, and/or the Amended Complaint, and in connection with the conduct of the Actions, that have been brought, could have been brought, or are currently pending in any forum in the United States.

(Settl. Agr., ECF No. 55, ¶ 2.40 (defining "Released Claims").[3])

As detailed by the parties, Epiq executed a robust notification plan in order to identify potential class members. In addition to a national digital notice campaign, which is discussed further below, Epiq sent 55 CAFA Notice Packages ("CAFA Notice") to 54 Attorneys General representing 48 states, the District of Columbia, and the U.S. Territories via mail, and to the Nevada and Connecticut Attorneys General via email. (Azari Decl., ECF No. 68-3, ¶ 8.) Epiq also sent a CAFA Notice via the United Parcel Service to the Attorney General of the United States. (*Id.*; *see also* Bingham Decl., ECF No. 68-4, ¶ 7.)

As for the "national digital/internet notice program," Epiq utilized digital notices and social media to reach approximately 70% of the potential Settlement Class Members. (Azari Decl., ECF No. 68-3, ¶ 7.) In addition, Epiq notified class members through "newspaper publication, internet sponsored search listings, an informational release, and a Settlement Website, which were not included in the [70%] reach calculation." (*Id.*) Notably, the Settlement Website, www.PotatoChipsSettlement.com, had 3,122,482 unique visitors as of March 31, 2025, and contained "[r]elevant documents . . . , including the Long Form Notice, Settlement Agreement, Preliminary Approval Order, Claim Form, Exclusion Form, Notice and Motion for Attorneys' Fees and Costs and Service Awards, and other case-related documents." (*Id.* ¶ 23.) The website also

---

[3] Any bodily injury claims arising out of a Settlement Class Member's use of the Products are excluded from the Released Claims. (Settl. Agr., ECF No. 55, ¶ 2.40.)

contained an online claim form, answers to common questions, instructions on how to opt out of or object to the settlement, and contact information for the settlement administrator. (*Id.*) Potential class members could arrive at the Settlement Website through advertisements on the Google Display Network and sponsored search listings on Google, Yahoo!, and Bing search engines. (*Id.* ¶¶ 13, 15, 16, 19–20.) In addition, Epiq placed digital notices on Facebook and Instagram. (*Id.* ¶ 14.)

Epiq also issued an information release "nationwide over *PR Newswire's U.S. 1 newsline* to approximately 13,000 general media outlets, including local and national newspapers, magazines, national wire services, television and radio broadcast media across the United States," to "approximately 4,000 websites, online databases, internet networks, and social networking media," and "to approximately 1,000 contacts in the Food Industry, General Foods & Nutrition and Organic Food categories." (*Id.* ¶ 21.) Newspaper publications were printed in the local editions of *USA Today* in San Francisco and Los Angeles to a circulation of 14,116, in "four insertions over four weeks." (*Id.* ¶ 18.)

Potential Settlement Class Members with questions had access to a toll-free phone line to obtain further information about the settlement at all times. (*Id.* ¶ 24.) At that number, callers could "hear an introductory message" and could "learn more about the Settlement in the form of recorded answers to FAQs," or could "request that a Long Form Notice and Claim Form ("Notice Package") be mailed to them." (*Id.*) Potential class members could opt out of the settlement or object to it until March 25, 2025. (Hr'g Tr., ECF No. 69, at 20:1–5; Mem. in Supp., ECF No. 56-1, at 24.) As of March 31, 2025, Epiq had not received any objections, and only seven potential Settlement Class Members had opted out. (Final Approval Mem., ECF No. 68-1, at 13; Azari Decl., ECF

No. 68-3, ¶ 29.) As of May 15, 2025, Epiq had not received any objections. (Hr'g Tr., ECF No. 69, at 28:12–29:2.)

In addition to the payments to the Settlement Class, the settlement agreement would award Class Counsel $1,333,333.33 in attorney's fees, which constitutes one-third of the settlement fund, and $22,847.61 in expenses. (Fees Mot., ECF No. 67, at 2; *see also* R. & R., ECF No. 61, at 18.) The proposed settlement would also award $10,000 total to Plaintiffs Jewel Rankins and Darren Wong, to be divided equally, in connection with their representation of the Settlement Class. (Fees Mot., ECF No. 67, at 2; *see* R. & R., ECF No. 61, at 18.) The parties also estimated $432,592 in administrative costs, which was disclosed to the putative Settlement Class in the long form notice. (*See* Attach. 7 to Azari Decl., ECF No. 68-3, at ECF p. 55 (long form notice); Hr'g Tr., ECF No. 69, at 41:15–24.)

## II.  Legal Standard

The Second Circuit has expressed a "strong judicial policy in favor of settlements, particularly in the class action context." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116–17 (2d Cir. 2005) (hereinafter "*Wal-Mart Stores*") (noting that "[t]he compromise of complex litigation is encouraged by the courts and favored by public policy"), *superseded on other grounds by Moses v. New York Times Co.*, 79 F.4th 235 (2d Cir. 2023). Under Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of . . . a class proposed to be certified for purposes of settlement may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e); *see also In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 328–30 (E.D.N.Y. 2010). To approve a class settlement under Rule 23(e), "the district court must determine that it is 'fair, adequate, and reasonable, and not a product of collusion.'" *Loc. 1180, Commc'ns Workers of Am., AFL-CIO v. City of New York*, 392 F. Supp. 3d 361, 374

(S.D.N.Y. 2019) (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)). In conducting this inquiry, courts consider the substantive and procedural fairness of a proposed settlement to determine "whether 'the terms of the settlement and the negotiation process leading up to it' are fair." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 408 (S.D.N.Y. 2018) (quoting *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008)), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020) (summary order); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("The District Court determines a settlement's fairness by examining the negotiating process leading up to the settlement as well as the settlement's substantive terms.").

In 2018, Rule 23(e) was revised to include a list of four "primary procedural considerations and substantive qualities that should always matter" in the court's "holistic" review of a proposed settlement. *Moses*, 79 F.4th at 242 (quoting Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment); *see also Schutter v. Tarena Int'l, Inc.*, No. 21-CV-3502 (PKC) (RML), 2024 WL 4118465, at *6 (E.D.N.Y. Sept. 9, 2024). These four factors include whether (1) class counsel and representatives adequately represented the class; (2) the settlement was negotiated at arm's length; (3) class members' relief is adequate, considering the costs, risks, and delay trial and appeal might pose along with attorney's fees; and (4) the settlement treats all class members equitably. Fed. R. Civ. P. 23(e)(2); *see also Kurtz v. Kimberly-Clark Corp.*, No. 14-CV-1142 (PKC) (RML), 2024 WL 184375, at *3 (E.D.N.Y. Jan. 17, 2024). The amendments "prohibit courts from applying a presumption of fairness to proposed settlements arising from an arms-length agreement" and instead require holistic review, including consideration of attorney's fees. *Moses*, 79 F.4th at 243.

Under Rule 23(e)(2)'s amendments, the court should still consider the nine familiar *Grinnell* factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (internal citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *Moses*, 79 F.4th at 243 (noting that "the revised Rule 23(e)(2) does not displace our traditional *Grinnell* factors, which remain a useful framework for considering the substantive fairness of a settlement"). However, Rule 23(e)(2) also "now mandates courts to evaluate factors that may not have been highlighted in our prior case law." *Moses*, 79 F.4th at 243. Specifically, the Court must consider two core factors: "the adequacy of relief provided to a class and the equitable treatment of class members," in addition to an assessment of attorney's fees. *Id.* at 244.

## III. Analysis

### A. Class Certification

"Before approving a class settlement agreement, a district court must first determine whether the requirements for class certification in Rule 23(a) and (b) have been satisfied." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012); *see also Johnson v. Rausch, Sturm, Israel, Enerson & Hornik, LLP*, 333 F.R.D. 314 (S.D.N.Y. 2019). As noted above, on December 6, 2024, Judge Vitaliano preliminarily certified the class for the purposes of settlement under Federal Rule of Civil Procedure 23(a) and

(b)(3). (Dec. 6, 2024 Order, ECF No. 64, at 3–4.) The Court now respectfully recommends that final certification for settlement purposes be granted as well.

1. *Rule 23(a)*

Rule 23(a) sets forth four threshold requirements for class certification: (1) numerosity ("joinder of all members is impracticable"); (2) commonality ("[common] questions of law or fact"); (3) typicality ("claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy ("representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a). As the Court has previously found, Plaintiffs have satisfied Rule 23(a)'s requirements. (*See generally* R. & R., ECF No. 61; December 6, 2024 Order, ECF No. 64.) As discussed below, the Court reiterates its previous finding that Plaintiffs have satisfied Rule 23(a)'s requirements. (*See* R. & R., ECF No. 61, at 23–28; December 6, 2024 Order, ECF No. 64, at 3–4.)

a. <u>Numerosity</u>

"The numerosity requirement mandates that the class be 'so numerous that joinder of all members is impracticable.'" *In re Sadia, S.A. Secs. Litig.*, 269 F.R.D. 298, 304 (S.D.N.Y. 2010) (quoting Fed. R. Civ. P. 23(a)(1)). The "inquiry is not strictly mathematical but must take into account the context of the particular case." *Penn. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). Generally, when a class consists of forty or more members, courts presume numerosity. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 263 n.20 (2d Cir. 2021).

Here, Plaintiffs state that "there is no dispute that hundreds of thousands of people nationwide purchased the Products during the Class Period." (Final Approval Mem., ECF No. 68-1, at 16.) Defendant concurs. (Prelim. Fairness Hr'g Tr., ECF No. 59,

at 40:3–8.) According to the settlement administrator, "it is estimated that there will be approximately 200,000 valid Claim Forms once all Claim Forms are received, processed, and the fraud review is completed." (Final Approval Mem., ECF No. 68-1, at 1; Azari Decl., ECF No. 68-3, ¶ 29; *see also* Hr'g Tr., ECF No. 69, at 22:23–23:13.) The Second Circuit recognizes that numerosity may be found where the proposed class is "obviously numerous." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). Accordingly, Plaintiffs have readily established that the numerosity requirement is satisfied. *See Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 211 (S.D.N.Y. 2021).

      b.  <u>Commonality & Typicality</u>

A class may only be certified if "there are questions of law or fact common to the class," and "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(2), (3). Analysis of the requirements of commonality and typicality "tend to merge" because "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011) (hereinafter "*Wal-Mart v. Dukes*"); *see also Marisol A.*, 126 F.3d at 376; *Scott v. Quay*, 338 F.R.D. 178, 188 (E.D.N.Y. 2021).

"The 'commonality requirement is met' where 'the plaintiffs' claims arise from the same alleged course of conduct and are based on legal theories similar to those of all the class members.'" *Hawaii Structural Ironworkers Pension Tr. Fund, Inc.*, 338 F.R.D. at 211–12 (quoting *In re Deutsche Telekom Ag Sec. Litig.*, 229 F. Supp. 2d 277, 281 (S.D.N.Y. 2002)). Similarly, typicality is met "when each class member's claim arises from the

same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376.

In this case, the parties agree that the packaging at issue was "uniform across the United States." *Elkind v. Revlon Consumer Prods. Corp.*, No. 14-CV-2484 (JS) (AKT), 2017 WL 9480894, at *13 (E.D.N.Y. Mar. 9, 2017). Therefore, there are common questions of law and fact related to whether Defendant made material misrepresentations and deceived consumers in the labeling, packaging, and marketing of the products which were "directed at both Plaintiffs and the other members of the proposed Settlement Class." (Final Approval Mem., ECF No. 68-1, at 17; *see generally* Am. Compl., ECF No. 65.) Each class member's claim arises out of the same course of events and requires the same legal arguments as to Defendant's liability. (*See* Hr'g Tr., ECF No. 69, at 23:17–22 (observing that "the packaging is uniform across the United States . . . and that the lead plaintiff's claims arise out of the same course of events and require the same legal arguments regarding defendant's liability as could be made on the behalf of the class members").)

Accordingly, Rule 23(a)'s requirements of commonality and typicality are satisfied. *See Hawaii Structural Ironworkers Pension Tr. Fund, Inc.*, 338 F.R.D. at 212; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 52–53 (E.D.N.Y. 2019); *see also In re Grana y Montero S.A.A. Sec. Litig.*, No. 17-CV-1105 (LDH) (ST), 2021 WL 4173684, at *9 (E.D.N.Y. Aug. 13, 2021), *report and recommendation adopted*, 2021 WL 4173170 (E.D.N.Y. Sept. 14, 2021).

c.  Adequacy of Representation

To satisfy Rule 23(a)(4)'s requirement "that all members of the class are adequately represented, district courts must make sure that the members of the class possess the same interests, and that no fundamental conflicts exist among the

members." *Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). In addition, courts must ensure "that 'class counsel is qualified, experienced, and generally able to conduct the litigation.'" *Marisol A.*, 126 F.3d at 378 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

In this case, the named Plaintiffs' interests align with those of the Settlement Class because Plaintiffs seek to represent "[a]ll persons in the United States who purchased any of Defendant's Products bearing the Non GMO Ingredients seal on the label within the applicable limitations period." (Am. Compl., ECF No. 65, ¶ 56.) Plaintiffs and the proposed class members all allegedly suffered damages arising out of Defendant's alleged violations of numerous states' consumer protection statutes as well as Connecticut common law, "in the same manner based on their purchase of the Products." (Final Approval Mem., ECF No. 68-1, at 18; *see generally* Am. Compl., ECF No. 65.) Absent any indication that Plaintiffs' interests in this action "are antagonistic to the interest[s] of other members of the class," the record demonstrates that Plaintiffs are well positioned to represent the proposed class. *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007).

Plaintiffs have also demonstrated a commitment to the litigation by retaining qualified and experienced lead counsel. (*See* R. & R., ECF No. 61, at 12–13; Decl. of Charles D. Moore, ECF No. 68-2, at ECF pp. 8–18 (hereinafter "Moore Final Decl.").) Class Counsel have substantial experience litigating class action lawsuits and have litigated on behalf of consumers in a range of false advertising cases. (*See* Moore Final Decl., ECF No. 68-2; Class Counsel Decl., ECF No. 67-2, ¶¶ 2–3, 18.) As detailed in the pleadings, motion papers, and at the preliminary fairness hearing, Class Counsel spent extensive time investigating the facts and applicable law of this case and evaluating the

strengths and weaknesses of the claims. (Prelim. Fairness Hr'g Tr., ECF No. 59, at 17:18–25, 8:18–9:7 (explaining that Class Counsel attended two mediation sessions and engaged in discovery prior to agreeing to the settlement); *see* R. & R., ECF No. 61, at 12–13; Moore Final Decl., ECF No. 68-2, ¶¶ 5, 7.) Counsel also ably represented the class at the final approval hearing. (*See generally* Hr'g Tr., ECF No. 69.)

Therefore, Plaintiffs have sufficiently shown that they are able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see also Lea v. Tal Educ. Grp.*, No. 18-CV-5480 (KHP), 2021 WL 5578665, at *6 (S.D.N.Y. Nov. 30, 2021); Fed. R. Civ. P. 23(e)(2)(A).

       d.  <u>Ascertainability</u>

"[A] class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Secs.*, 862 F.3d 250, 257 (2d Cir. 2017). While district courts "have expressed conflicting views on whether putative classes are ascertainable when consumers are unlikely to retain receipts or other records of purchase," the Court concludes that the class is reasonably ascertainable here. *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 66 (E.D.N.Y. 2015). The class is clearly defined. (Am. Compl., ECF No. 65, ¶ 56.) Class members may self-identify, must swear under penalty of perjury that any claims without proof of purchase are accurate, and cannot successfully claim more than 10 purchases per household without supporting documentation. (*See* Settl. Agr., ECF No. 55, ¶ 3.4.) With these safeguards in place, proof of purchase is not required. "To require receipts [in circumstances like the instant case] 'would render class actions against producers almost impossible to bring.'" *Belfiore*, 311 F.R.D. at 66–67 (quoting *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014)). The Court finds that the class is sufficiently ascertainable because the proposed settlement agreement clearly outlines class membership and balances opportunities for

self-identification with reasonable safeguards against fraud. (*See also* Hr'g Tr., ECF No. 69, at 10:23–11:17 (discussing Epiq's approach to identifying fraudulent claims and ascertainability).)

    2. *Rule 23(b)(3)*

"In addition to satisfying the Rule 23(a) requirements, certification must be appropriate under Rule 23(b)." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *10 (quotation marks omitted); *see also Rosi v. Aclaris Therapeutics, Inc.*, No. 19-CV-7118 (LJL), 2021 WL 5847420, at *2 (S.D.N.Y. Dec. 9, 2021). Rule 23(b)(3) permits a class action to be maintained if the court finds "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Wang v. Tesla, Inc.*, 338 F.R.D. 428, 441 (E.D.N.Y. 2021) (quoting *Amchem*, 521 U.S. at 623). Predominance is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Id.* (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010); *see also Cordes & Co.*, 502 F.3d at 107–08). To establish the superiority prong of this inquiry, "the moving party must show that 'the class action presents economies of time, effort and expense, and promote[s] uniformity of decision.'" *Lea*, 2021 WL 5578665, at *6 (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) (quotation marks omitted)).

In this case, as discussed above, the proposed Settlement Class Members' claims involve common questions of law and fact. Plaintiffs and the proposed Settlement Class

Members suffered the same basic harm due to the same alleged misconduct by Defendant. While there may be issues unique to each class member, the common questions here are subject to "generalized proof, and thus applicable to the class as a whole," and they "predominate over those issues that are subject only to individualized proof." *Cordes & Co.*, 502 F.3d at 108 (quotation marks omitted). Therefore, the Court finds that the proposed class is "'sufficiently cohesive to warrant adjudication by representation.'" *Wang*, 338 F.R.D. at 441 (quoting *Amchem*, 521 U.S. at 623); *see also Amchem*, 521 U.S. at 625 (explaining that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws").

In addition, considering the numerosity of class members, the uniformity of their claims, and their geographic dispersion, there is a strong basis for finding that class adjudication is superior to individual litigation. (*See* R. & R., ECF No. 61, at 28; Final Approval Mem., ECF No. 68-1, at 19–20.) *See Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 661 (S.D.N.Y. 2015). Furthermore, given Plaintiffs' assertion that the "cost to purchase any of the Products is less than $5.00," and that the affected injury concerns "premium" pricing, which resulted in a relatively small injury to class members per purchase, individual actions would certainly prove less efficient than a class-wide proceeding. (*See* R. & R., ECF No. 61, at 28; Final Approval Mem., ECF No. 68-1, at 20.) *See Meredith Corp.*, 87 F. Supp. 3d at 661; *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980).

## B. Settlement Approval

As discussed above, a district court's approval of a class action settlement is contingent on a finding that the settlement is "fair, reasonable, and adequate," which is determined by an evaluation of a settlement's procedural and substantive fairness. Fed.

R. Civ. P. 23(e)(2); *see D'Amato*, 236 F.3d at 85; *see also Lea*, 2021 WL 5578665, at *7; *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *11.[4]

       1.  *Procedural Fairness*

      "To evaluate the procedural fairness of a proposed settlement, a court must expressly consider the two factors under Rules 23(e)(2)(A)–(B): whether 'the class representatives and class counsel have adequately represented the class' and whether 'the proposal was negotiated at arm's length.'" *Schutter*, 2024 WL 4118465, at *7 (quoting Fed. R. Civ. P. 23(e)(2)(A)–(B)); *see also Ying v. All-Ways Forwarding of N.Y. Inc.*, No. 20-CV-6242 (ENV) (MMH), 2025 WL 968586, at *6 (E.D.N.Y. Mar. 31, 2025).

       a.  <u>Adequacy of Representation</u>

      "In determining the adequacy of class representatives and counsel, courts consider 'whether (1) plaintiff[s'] interests are antagonistic to the interests of other members of the class and (2) plaintiff[s'] attorneys are qualified, experienced[,] and able to conduct the litigation.'" *Rosenfeld v. Lenich*, No. 18-CV-6720 (NGG) (PK), 2021 WL 508339, at *4 (E.D.N.Y. Feb. 11, 2021) (quoting *Cordes & Co.*, 502 F.3d at 99); *see Payment Card*, 330 F.R.D. at 30 n.25 (explaining that "Rule 23(a)(4) case law . . . guide[s]" the Rule 23(e)(2)(A) analysis). Class representatives "'must be part of the class and possess the same interest and suffer the same injury as the [other] class members.'" *Wal-Mart v.*

---

[4] As noted *supra*, "Rule 23 also requires the court to consider several criteria — some of which overlap with the *Grinnell* factors — that inform whether the settlement is fair, reasonable, and adequate." *In re Parking Heaters, Antitrust Litig.*, No. 15-MC-940 (DLI) (JO), 2019 WL 8137325, at *4 (E.D.N.Y. Aug. 15, 2019), *report and recommendation adopted*, Sept. 30, 2019 ECF Order; *see also* Fed. R. Civ. P. 23(e)(2)(A)–(D). These factors do not displace the *Grinnell* factors, but rather "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal," given that "[t]he central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. Accordingly, in light of the significant overlap between the relevant Second Circuit case law and the Rule 23(e)(2) factors, the Court incorporates the Rule 23 factors into its analysis throughout.

*Dukes*, 564 U.S. at 348–49 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)); *see also Payment Card*, 330 F.R.D. at 31 (explaining that the Due Process Clause requires adequate representation). As for class counsel, "[a] court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that . . . counsel have possessed the experience and ability, and have engaged in the discovery necessary to effective representation of the class's interests." *D'Amato*, 236 F.3d at 85 (quotation marks omitted); *see also* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment ("For example, the nature and amount of discovery in this or other cases . . . may indicate whether counsel negotiating on behalf of the class had an adequate information base.").

As discussed above, Plaintiffs' interests are aligned with those of the non-named class members for the purposes of satisfying Rule 23(a)(4). The Court further finds that Class Counsel's experience in class action settlements and efforts in this case satisfy both prongs of the adequacy of class representation requirement. Given the similarities between the adequacy assessments under Rule 23(e)(2)(A) and Rule 23(a)(4), the Court also concludes that the "class representatives and class counsel provided adequate representation to the putative class[] under Rule 23(e)(2)(A)." *Schutter*, 2024 WL 4118465, at *7 (citing *Payment Card*, 330 F.R.D. at 54).

  b. <u>Arm's Length Negotiation</u>

Plaintiffs represent that the $4,000,000 global settlement was reached after extensive arm's-length negotiations between experienced counsel, including an all-day mediation with mediator Jill R. Sperber. (*See* Hr'g Tr., ECF No. 69, at 21 (representing that the settlement "was basically negotiated by a very skilled mediator, Jill Sperber"); Final Approval Mem., ECF No. 68-1, at 3; *see* Moore Final Decl., ECF No. 68-2.) There is no "'evidence or indicia suggesting that the negotiations were collusive'" in the record

before the Court. *Gordon v. Vanda Pharms. Inc.*, No. 19-CV-1108 (FB) (LB), 2022 WL 4296092, at *4 (E.D.N.Y. Sept. 15, 2022) (quoting *Simerlein v. Toyota Motor Corp.*, No. 17-CV-1091 (VAB), 2019 WL 1435055, at *13 (D. Conn. Jan. 14, 2019)).

Accordingly, the Court concludes "that the parties gained sufficient information about the claims through mediation and settlement discussions to allow them to make a reasoned evaluation of the chances of success," and therefore, "finds that there was procedural fairness in reaching the proposed settlement." *Burns v. FalconStor Software, Inc.*, No. 10-CV-4572 (ERK) (CPL), 2014 WL 12917621, at *4 (E.D.N.Y. Apr. 11, 2014), *report and recommendation adopted*, May 8, 2014 ECF Order; *see also* Fed. R. Civ. P. 23(e)(2)(B); *Lea*, 2021 WL 5578665, at *8; *D'Amato*, 236 F.3d at 85.

2.  *Substantive Fairness*

For consideration of whether "the relief provided for the class is adequate," Fed. R. Civ. P. 23(e)(2)(C), the Court now turns to the *Grinnell* factors to evaluate the proposed settlement's substantive fairness.

a.  Complexity, Expense, & Likely Duration of Litigation

Although difficult to predict, the complexity, expense, and likely duration of the litigation favor the proposed settlement. Courts must assess whether the proposed settlement "'results in substantial and tangible present recovery, without the attendant risk and delay of trial.'" *Rosenfeld*, 2021 WL 508339, at *5 (quoting *Payment Card*, 330 F.R.D. at 36).

This case has already been pending for more than five years. Plaintiffs represented that without approval of the settlement agreement, litigation would resume, including possible "contested class certification, competing expert testimony and contested *Daubert* motions; further costly factual discovery; costly merits and class expert reports and discovery; and trial." (Final Approval Mem., ECF No. 68-1, at 9; *see also*

Moore Final Decl., ECF No. 68-2, ¶ 8.) The parties agree that continued litigation would be extremely costly and time intensive. (Prelim. Fairness Hr'g Tr., ECF No. 59, at 23:14–16, 23:25–24:2; Hr'g Tr., ECF No. 69, at 22:15–22 (discussing anticipated defenses if settlement is not approved); *id.* at 27:6–28:15.) In short, the record amply establishes that further litigation would be complex, expensive, and very time consuming. Accordingly, this *Grinnell* factor, in addition to Federal Rule of Civil Procedure 23(e)(2)(C)(i), favors settlement.

       b.  <u>Reaction of the Class to the Settlement</u>

      The reaction of the class also favors the proposed settlement. As the Second Circuit has noted, if "'only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.'" *Wal-Mart Stores*, 396 F.3d at 118 (quoting 4 *Newberg on Class Actions* § 11.41, at 108 (4th ed. 2002)); *see also In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 311 (E.D.N.Y. 2006). To date, as mentioned *supra*, Plaintiffs have estimated that the settlement will be ultimately involve approximately 200,000 valid claims. (Hr'g Tr., ECF No. 69, at 9:13–10:1; Final Approval Mem., ECF No. 68-1, at 13; Azari Decl., ECF No. 68-3, ¶ 29.) The record also indicates that the notice procedures were effective, as discussed further below. For example, "[t]he sponsored listings were displayed 243,456 times, which resulted in 9,239 clicks that displayed the Settlement Website." (Azari Decl., ECF No. 68-3, ¶ 20.) In addition, "[a]s of March 31, 2025, there have been 3,122,482 unique visitor sessions to the case website, and 11,771,072 web pages have been presented." (Azari Decl., ECF No. 68-3, ¶ 23.) A notice was published in the San Francisco and Los Angeles editions of *USA Today* in four insertions over four weeks. (*Id.* ¶ 18.) Moreover, a toll-free number was created for this specific class settlement, and as of the date the motion for final settlement approval was filed, Epiq had received 646 calls to the toll-free telephone

number. (*Id.* ¶ 24.) Class members had until March 25, 2025, to object to the settlement or request exclusion from the Settlement Class, and as of the May 15, 2025 Fairness Hearing, there had been no objections, and only seven requests for exclusion. (*Id.* ¶ 27; Hr'g Tr., ECF No. 69, at 20:1–5, 28:17–29:2.) Given the robust notice procedures and lack of objection to the proposed settlement, the Court concludes that this factor favors settlement approval.

c.  Stage of the Proceedings & the Amount of Discovery Completed

For this factor to favor settlement, the court must ensure that the parties have conducted a factual investigation sufficient for the court to evaluate the proposed settlement and confirm that pretrial negotiations were adequately adversarial. *See Plummer v. Chem. Bank*, 668 F.2d 654, 660 (2d Cir. 1982); *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato*, 236 F.3d at 85–86. In this case, the Court previously denied Defendant's motion to dismiss in part, the parties have engaged in preliminary fact discovery, and Plaintiffs contend that they "have sufficient information to evaluate the terms of the proposed Settlement." (Final Approval Mem., ECF No. 68-1, at 13; *see* Mem. & Order, ECF No. 44; R. & R., ECF No. 61, at 19–20; Prelim. Fairness Hr'g Tr., ECF No. 59, at 9:13–16.) As discussed at the May 15, 2025 Fairness Hearing, there was some discovery in the case, including "document production from both sides, interrogatories, . . . and request[s] for admission," as well as evaluation of the core issue in the case, i.e., "would a reasonable consumer be misled" by the packaging. (Hr'g Tr., ECF No. 69, at 29:10–11, 29:17.)

In light of the amount of discovery, litigation, and research that preceded the parties' decision to settle, this factor weighs in favor of approving the proposed settlement. *See Burns*, 2014 WL 12917621, at *5; *Lea*, 2021 WL 5578665, at *9.

26

d. Risks of Establishing Liability

When considering the risks of proceeding to the merits, "the Court need not adjudicate the disputed issues or decide unsettled questions; rather, 'the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement.'" *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *13 (quoting *In re Glob. Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004)). Here, Plaintiffs "face substantial risks in establishing liability." *Id.* The Court granted Defendant's motion to dismiss with prejudice as to Plaintiffs' claim for breach of express warranty, unjust enrichment and any claims for injunctive relief, and deferred questions of personal jurisdiction over putative class members until the class certification stage. (*See* Mem. & Order, ECF No. 44.) Plaintiffs believe that "their claims are strong but recognize that continuation of this litigation poses significant risks," including increased costs. (Final Approval Mem., ECF No. 68-1, at 15; Moore Final Decl., ECF No. 68-2, ¶ 7.) In addition, Plaintiffs' counsel noted that there is also a risk that Plaintiffs would not be able to certify a class, because although Defendant agreed to class certification, it was for settlement purposes only, and Defendant "continues to deny all of Plaintiffs' allegations," and "but for the Settlement, it would vigorously oppose class certification." (Moore Final Decl., ECF No. 68-2, ¶ 8.) Defendant confirmed this position at the final fairness hearing. (Hr'g Tr., ECF No. 69, at 33:21–24.)

For all of these reasons, the Court finds that the $4,000,000 proposed settlement eliminates a substantial risk of establishing Defendant's liability and favors the motion for final settlement approval. *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 177; *see also Massiah v. MetroPlus Health Plan, Inc.*, No. 11-CV-5669 (BMC), 2012 WL 5874655, at *4 (E.D.N.Y. Nov. 20, 2012) (explaining that "[o]ne purpose of a settlement is to avoid the uncertainty of a trial on the merits"); Fed. R. Civ. P. 23(e)(2)(C)(i).

e.   Risks of Establishing Damages

Plaintiffs face substantial risks in proving significant damages. Plaintiffs' counsel concede that "the action involves uncertainties as to their outcome." (Final Approval Mem., ECF No. 68-1, at 10). Counsel further acknowledges that "[f]urther litigation presents no guarantee for recovery, let alone a recovery greater than the recovery for which the Settlement provides." (*Id.*; *see also* Hr'g Tr., ECF No. 69, at 32:2–20 (discussing difficulty of establishing damages and observing that consumers "are getting back 50 cents per product that they claim," and contending that "class members are receiving through the settlement[] as much, if not greater than" the amount they could receive after trial).) In light of these risks, the Court finds this factor also favors settlement. *See Mikhlin v. Oasmia Pharm. AB*, No. 19-CV-4349 (NGG) (RER), 2021 WL 1259559, at *6 (E.D.N.Y. Jan. 6, 2021) (noting that where "[b]oth parties would present expert testimony on the issue of damages," it is "'virtually impossible to predict' which side's testimony would be found more credible, as well as 'which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions'" (quoting *Strougo v. Bassini*, 258 F. Supp. 2d 254, 259–60 (S.D.N.Y. 2003))); *see also* Fed. R. Civ. P. 23(e)(2)(C)(i).

f.   Risks of Maintaining a Class Action Through Trial

"Courts generally acknowledge that a contested motion to certify a class would pose at least some increased risk that class certification might be denied." *Mikhlin*, 2021 WL 1259559, at *6 (citing *Payment Card*, 330 F.R.D. at 39–40). Here, where the parties stipulated to class certification for the purpose of settlement, and Defendant would

have vigorously opposed certification otherwise,[5] "[t]he risks attendant to certifying a class and defending any decertification motion supports approval of the settlement." *Lea*, 2021 WL 5578665, at *10 (citing *Garland v. Cohen & Krassner*, No. 08-CV-4626 (KAM) (RLM), 2011 WL 6010211, at *8 (E.D.N.Y. Nov. 29, 2011)); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *5 ("The risk of maintaining a class throughout this long and protracted litigation weighs in favor of settlement approval.").

> g.   Ability of Defendant to Withstand a Greater Judgment

"This factor stands for the proposition that if a defendant could not withstand a greater judgment than what is provided for in the settlement, then the settlement is more likely to be reasonable, fair, and adequate." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *14. As to this factor, neither party has claimed that the proposed settlement amount approaches the upper limit of Old Lyme's ability to pay. (*See* Prelim. Fairness Hr'g Tr., ECF No. 59, at 35:5–37:7.) Rather than focusing on Defendant's ability to pay, the parties crafted the proposed settlement primarily to restore reasonable value to class members based on actual claims of harm, which flow from the allegation that Plaintiffs and the other class members paid a "premium price" in part due to the allegedly misleading product labeling. (Prelim. Fairness Hr'g Tr., ECF No. 59, at 38:3, 38:2–17, 39:1–3; *see also* Hr'g Tr., ECF No. 69, at 33:25–34:13 (discussing *Grinnell* factor seven).)

Accordingly, although Defendant "may have been able to withstand a greater judgment, 'the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate . . .

---

[5] (*See* Moore Final Decl., ECF No. 68-2, ¶ 8; Final Approval Mem., ECF No. 68-1, at 9.)

especially where other applicable factors weigh heavily in favor of settlement approval." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 460; *see also Payment Card*, 330 F.R.D. at 47. Accordingly, as the Court previously concluded, although the proposed $4,000,000 settlement amount may be less than Defendant's theoretical capacity to pay, given that the settlement provides reasonable value based on consumers' actual claims, the Court finds that this factor should not preclude settlement approval. (*Cf.* R. & R., ECF No. 61, at 20.)

  h.   Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of All Attendant Risks of Litigation

These final two *Grinnell* factors "are often combined for the purposes of analysis." *Payment Card*, 330 F.R.D. at 48. "In considering the reasonableness of the settlement fund, a court must compare the terms of the compromise with the likely rewards of litigation." *Id.* (quotation marks omitted); *see also* Fed. R. Civ. P. 23(e)(2)(C)(i). "[S]ettlements have been approved as reasonable where the settlement provides a 'meaningful benefit' to the class." *Burns*, 2014 WL 12917621, at *5 (quoting *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d at 340).

Here, Plaintiffs represented that the claim value was based on "a fairly sound estimate of what [any class member's] likely injury would be per product," and that reflects "the best possible recovery considering the merits of the Settlement weighted against the cost and risks of further litigation." (Prelim. Fairness Hr'g Tr., ECF No. 59, at 39:1–3; Final Approval Mem., ECF No. 68-1, at 15.) Plaintiffs also posit that, pursuant to the terms in the Settlement Agreement, the "Settlement Class Members will receive full or nearly full compensation for their injury." (Final Approval Mem., ECF No. 68-1, at 15.) As discussed above and in the preliminary approval Report and Recommendation, the settlement here seeks to compensate claimants for premium pricing, not for the

entire cost of each bag of chips. (*See* R. & R., ECF No. 61, at 20.) If the total number of claims exhausts the settlement fund, each valid claim would be subject to "a pro rata decrease," and every claimant would be "treated the same." (Hr'g Tr., ECF No. 69, at 36:14–17.) If the parties' predictions are correct and the total number of claims does not initially exhaust the settlement fund, each claimant would receive a "pro rata increase" to deplete the fund. (*Id.* at 36:18–20.) On the other hand, for the reasons discussed *supra*, continuation of litigation poses significant risks and would lead to substantial expenditures, by both parties, while no further benefits are guaranteed to the Settlement Class.

Based on the substantial litigation risks discussed above, because the settlement is reasonably calculated to compensate the Settlement Class Members for their injuries, and in light of the fact that the settlement here was reached with the assistance of an experienced mediator, the Court concludes that the settlement amount is within a reasonable range. *See Grinnell*, 495 F.2d at 455 n.2 ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."); *see also In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 270 (S.D.N.Y. 2012) ("It is well-settled that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair." (quotation marks omitted)); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 178 (W.D.N.Y. 2011) ("It is more important to assess the judgment in light of plaintiffs' claims and the other factors . . . ."); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 483 (S.D.N.Y. 2009) (approving $586 million settlement that represented only 2% of aggregate expected recovery).

3. *Allocation of Settlement Fund*

The method of distributing relief and processing class member claims also supports approving the settlement. *See* Fed. R. Civ. P. 23(e)(2)(C)(ii). Like the settlement agreement itself, the plan of allocation "must also be fair and reasonable." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. at 316; *see also In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 158 (S.D.N.Y. 2013) ("When formulated by competent and experienced counsel, a plan for allocation of net settlement proceeds need have only a reasonable, rational basis."). Furthermore, a proposed claims processing method "should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Payment Card*, 330 F.R.D. at 40 (citing Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment). Based on the approximate value of the Settlement Class's premium pricing injury and the parties' estimate of the number of valid claims that will be presented, the Court finds that class members who submit claims in this case will likely be mostly or completely compensated for their injuries.

Here, the method for processing Settlement Class Members' claims and distributing the net settlement fund to eligible claimants includes well established, effective procedures, and was "formulated and is being overseen by" an expert in the field of legal notice. (*See* Final Approval Mem., ECF No. 68-1, at 10.) The Settlement Agreement provides that each "Class Member who submits a valid claim, with a proof of purchase, shall receive $5.00 for the first product claimed and $0.50 for each additional product claimed that is submitted with a proof of purchase," with no limit on the number of products claimed with a proof of purchase, and that each "Class Member who submits a valid claim, without a proof of purchase, shall receive $5.00 for the first product claimed and $0.50 for each additional product claimed up to a maximum of ten (10) additional products claimed, for a total of $10.00." (Settl. Agr.,

ECF No. 55, ¶ 3.4(a)–(b) (cleaned up).) Plaintiffs note that every class member is eligible for the same relief, and that "each Class Member is treated equally relative to each other" in the Settlement Agreement. (Final Approval Mem., ECF No. 68-1, at 12.) In addition, Class Members are allowed to make their claims online, and have an option of being paid electronically, thereby making the claims and distribution processes easy and efficient. (Final Approval Mem., ECF No. 68-1, at 10.) This methodology is appropriate and consistent with many other class action settlements' plans of allocation, and treats class members equitably relative to each other. *See Lea*, 2021 WL 5578665, at *11; *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. at 317; Fed. R. Civ. P. 23(e)(2)(D).[6]

  4.  *Identification of Other Agreements*

Federal Rule of Civil Procedure 23(e) requires the Court to take into account "any agreement made in connection with" the proposed settlement. Fed. R. Civ. P. 23(e)(3), (e)(2)(C)(iv). Here, the parties represent that they have not entered into any other agreements. (Hr'g Tr., ECF No. 69, at 42:1–4; Final Approval Mem., ECF No. 68-1, at 11; Prelim. Fairness Hr'g Tr., ECF No. 59, at 29:19–30:4.) Accordingly, this factor weighs in favor of final approval of the settlement.

---

[6] Rule 23(e)(2)(D) requires the Court to consider whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). To do so, the Court must evaluate "'whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.'" *Moses*, 79 F.4th at 245 (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment); *see also Schutter*, 2024 WL 4118465, at *10. Given the Court's findings as to why the settlement amount and plan of allocation are reasonable and fair, the Court also finds that the proposal treats class members equitably relative to each other. To the extent that the two lead Plaintiffs are to be treated differently because they will receive service awards, the awards are appropriate for the reasons discussed *infra*.

### C. Attorneys' Fees and Costs & Plaintiff Awards

The Court must also consider "the terms of any proposed award of attorney's fees." Fed. R. Civ. P. 23(e)(2)(C)(iii). Here, Class Counsel seek an attorneys' fee award of $1,333,333.33, which equals one-third of the settlement amount, along with $22,847.61 in costs, and, as discussed above, $5,000 for each of the two named Plaintiffs. (*See* Fees Mem., ECF No. 67-1, at 3; Final Approval Mem., ECF No. 68-1, at 4.) Class Counsel contend that these amounts are warranted based upon the risks involved in the litigation, the quality of counsel, and the fees granted in similar class action litigations. (*See* Final Approval Mem., ECF No. 68-1, at 4, 8, 11.) Having reviewed the documents submitted by Class Counsel in support of their requests, including attorney declarations, billing records, and invoice summaries for the claimed costs, the Court finds that attorneys' fees totaling $1,333,333.33, $22,847.61 in costs, and $5,000 for each of the two named Plaintiffs, are reasonable, and therefore recommends approval of the requested fees, costs, and awards.[7]

---

[7] Federal Rule of Civil Procedure 23(e)(2)(C)(iii) also requires courts to consider the "timing of payment" for "any proposed award of attorney's fees." Fed. R. Civ. P. 23(e)(2)(C)(iii). Here, the parties' settlement agreement states that "[a]ll Attorneys' Fees and Costs, as well as the Service Awards, shall be paid by the Claim Administrator from the Settlement Fund" within five days of the "effective date" of the settlement agreement. (Settl. Agr., ECF No. 55, ¶¶ 5.5, 5.7, 2.17 (defining the effective date as the date on which "Final Approval is final" and there is no further time for appeal or review).) While courts in this circuit have found "quick-pay" provisions like this one to be objectionable in certain cases, *see, e.g., Hart v. BHH, LLC*, 334 F.R.D. 74, 77 (S.D.N.Y. 2020), the Court does not find such an arrangement to be problematic here because (1) the claims administrator is tasked with distributing the fund to approved claimants, not counsel; and (2) the Court will retain jurisdiction over any disputes arising out of the implementation of the settlement agreement. (Settl. Agr., ECF No. 55, ¶ 9.14.) Accordingly, while the timing of the award of attorneys' fees does not necessarily "bolster the case for . . . approval, it also does not undercut th[e] case where, as here, the majority of other factors weigh significantly in its favor." *Mikhlin*, 2021 WL 1259559, at *7.

1.  *Attorneys' Fees*

When determining appropriate counsel fees in class actions, courts generally use "the lodestar method or award[] fees based on a percentage of the settlement fund." *In re Parking Heaters, Antitrust Litig.*, No. 15-MC-940 (DLI) (JO), 2019 WL 8137325, at *6 (E.D.N.Y. Aug. 15, 2019) (citing *Goldberger*, 209 F.3d at 47), *report and recommendation adopted*, Sept. 30, 2019 ECF Order. The "lodestar method" multiplies a reasonable number of hours spent on the case by a reasonable hourly rate, whereas the "common fund method" calculates the fee amount as a percentage of the total award. *Id.* (citing *McDaniel v. County of Schenectady*, 595 F.3d 411, 417–22 (2d Cir. 2010)). Courts using the percentage of the fund method, which is the "trend in this Circuit," will also "cross-check the percentage fee against counsel's 'lodestar' amount of hourly rate multiplied by hours spent." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *9 (citing *Wal-Mart Stores*, 396 F.3d at 121; *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011)). Under either method, courts will also consider the following *Goldberger* factors: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *In re Grana y Montero S.A.A. Sec. Litig.*, 2021 WL 4173684, at *16 (citing *Goldberger*, 209 F.3d at 50); *see also Burns*, 2014 WL 12917621, at *8 (same).

As discussed, counsel seeks one-third of the settlement fund, or $1,333,333.33. (Fees Mem., ECF No. 67-1, at 3.) Analyzing this requested award against the *Goldberger* factors and cross-checking it against the lodestar both favor approval of the requested fees.

a. <u>Goldberger Factors</u>

As to the first and second *Goldberger* factors, the time and labor expended by Class Counsel in this case is reasonable considering the duration and complexity of the litigation, which involved allegations concerning bioengineered foods and reasonable consumer standards. (*See* Fees Mem., ECF No. 67-1, at 10–11; Final Approval Mem., ECF No. 68-1, at 9.) This case has been pending for more than five years, required litigating a motion to dismiss, and included extensive settlement negotiations with the assistance of a professional mediator. (*See* Fees Mem., ECF No. 67-1, at 1–2.) Moreover, the claimed time is supported by Class Counsel's declaration and corresponding billing records. (*See* Class Counsel Decl., ECF No. 67-2, at 7–9.) *See generally In re Parking Heaters, Antitrust Litig.*, 2019 WL 8137325, at *7 (recognizing that "class actions like these are complex, expensive, and lengthy").

The third factor, the risk of litigation, which is "often cited as the first, and most important, *Goldberger* factor," weighs in favor of approving the requested fee, as "[c]lass counsel undertook this litigation on a contingent basis and have received no payment for their work" thus far. *Lea*, 2021 WL 5578665, at *12 (citing *Goldberger*, 209 F.3d at 54; *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d at 361). Indeed, as discussed above, as Plaintiffs' counsel note, "Defendant continues to deny all of Plaintiffs' allegations, has stated that but for the Settlement, it would vigorously oppose class certification. Should this matter proceed, it will vigorously defend itself on the merits." (Moore Final Decl., ECF No. 68-2, ¶ 8.) Defendant has also made clear that they "would challenge Plaintiffs at every litigation step, presenting significant risks of ending the litigation while increasing costs to Plaintiffs and the Settlement Class Members." (*Id.*)

With respect to the fourth factor, as noted above, Class Counsel possess substantial experience litigating consumer class action cases and have provided quality

representation to Plaintiffs and the putative class by, among other things, successfully negotiating a settlement. (*See, e.g.*, Reese LLP Law Firm Resume, ECF No. 68-2, at ECF p. 9; Sheehan & Associates P.C. Firm Resume, ECF No. 68-2, at ECF p. 16; Fees Mem., ECF No. 67-1, at 12–13.)

In analyzing the fifth factor, the Court notes that the requested one-third fee constitutes a proportion routinely approved as reasonable, and no opposition to the request has been advanced by the Settlement Class Members. *See, e.g.*, *Payment Card*, 991 F. Supp. 2d at 445 ("[I]t is very common to see 33% contingency fees in cases with funds of less than $10 million . . . ."); *see also Burns*, 2014 WL 12917621, at *10.

Finally, public policy considerations also favor approval of the requested fee amount. Courts in the Second Circuit have recognized a "'strong judicial policy in favor of settlements, particularly in the class action context.'" *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009) (quoting *Wal-Mart Stores*, 396 F.3d at 116), *superseded on other grounds*, *Moses*, 79 F.4th 235. In addition, as part of the settlement, Defendant has agreed to refrain from using the product labeling that was allegedly misleading on its packaging. (Settl. Agr., ECF No. 55, ¶ 3.16; Class Counsel Decl., ECF No. 67-2, ¶ 13 (describing Defendant's agreement to refrain from using the allegedly misleading labeling on its products as "an outstanding result for Plaintiffs and the members of the Settlement Class").)

      b.  Lodestar Cross-Check

The requested fees are also reasonable under the lodestar method. As of the time the fee motion was filed, Class Counsel represented that they had spent 866.8 total hours litigating this case, producing an aggregate lodestar amount of $1,261,037.50 when multiplied by counsel's hourly billing rates. (Class Counsel Decl., ECF No. 67-2,

¶ 21.)[8] The Court's *ex parte* review of the billing records revealed that counsel have now spent over 885 hours on the case. Even considering the lower number of hours included in the fee motion, as of that time, counsel's lodestar equaled approximately 94.6% of counsel's total requested fee. This calculation results in a lodestar multiplier of approximately 1.05, which is "well within the range of multipliers routinely granted by courts within the Second Circuit." (Fees Mem., ECF No. 67-1, at 8.) *See also Wal-Mart Stores*, 396 F.3d at 123 (upholding a multiplier of 3.5 as reasonable on appeal); *Burns*, 2014 WL 12917621, at *10 (holding a fee award of 33.3% as reasonable based on cross-check multiplier of 4.75); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1988) (upholding a multiplier of 3.97 as reasonable).

The Court notes, however, that Class Counsel's billing records reflect hourly rates that exceed those normally approved in this district for similar services. *See In re KeySpan Corp. Sec. Litig.*, No. 01-CV-5852 (ARR), 2005 WL 3093399, at *14 (E.D.N.Y. Sept. 30, 2005) ("The reasonable hourly rates should be based on the rates 'prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation.'") (citing *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1159 (2d Cir. 1994)); *Rosenfeld v. Lenich*, No. 18-CV-6720 (NGG) (PK), 2022 WL 2093028, at *4 (E.D.N.Y. Jan. 19, 2022) (approving hourly rates ranging from $225 to $900, which are "regularly accepted in this Circuit" as "well within the range of reasonableness" in a large class

---

[8] Each firm calculated their own lodestar. Partners at Reese LLP spent 679.3 hours working on this case, and billed at rates ranging from $1,125 per hour for a partner to $1,625 for the managing and senior partners, resulting in a lodestar of $1,082,912.50. (Class Counsel Decl., ECF No. 67-2, ¶¶ 21–22.) Sheehan & Associates' founding partner worked on the case for 187.5 hours and billed at a rate of $950 per hour, resulting in a lodestar of $178,125. (*Id*. ¶ 26.) Although counsel's hourly rates are higher than those normally awarded in the Eastern District of New York, the lodestar cross-check supports counsel's fee award overall.

action settlement); *Everetts v. Pers. Touch Holding Corp.*, No. 21-CV-2061 (JMA) (ARL), 2025 WL 942800, at *5 (E.D.N.Y. Mar. 28, 2025) (noting that recent cases have approved awards ranging from $100 per hour for paralegals to up to $630 per hour for partners). However, even applying these reduced hourly rates to the lower number of hours reflected in the fee motion, a reasonable aggregate lodestar is $654,895, which would produce a lodestar multiplier of approximately 2.03 relative to the requested fee amount.[9]

Even at this reduced amount, the multiplier is lower than those typically deemed reasonable in complex consumer class actions in this Circuit. *See Pantelyat v. Bank of Am., N.A.*, No. 16-CV-8964 (AJN), 2019 WL 402854, at *10 (S.D.N.Y. Jan. 31, 2019) (stating that a 4.89 lodestar multiplier is reasonable); *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 623 (S.D.N.Y. 2012) ("Courts regularly award lodestar multipliers from 2 to 6 times lodestar.") (collecting cases). Moreover, counsel will expend additional time on this litigation following the adjudication of these motions, which will increase any lodestar calculations. Accordingly, the lodestar cross-check also favors awarding the requested attorneys' fee.

In light of the foregoing, the Court respectfully recommends that Class Counsel's request for attorneys' fees in the amount of one-third of the settlement fund be approved.

---

[9] The Court calculated this reduced lodestar by multiplying the hours spent on the litigation as of the date of the motion for final settlement approval by hourly rates the Court finds reasonable for this district, i.e., $900 for partners, $700 for attorneys who hold the position of counsel, and $225 for associates.

2. *Attorneys' Expenses*

"The Court may award counsel reasonable out-of-pocket expenses that were necessary to successfully litigate and resolve the action." *Burns*, 2014 WL 12917621, at *11 (citing *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d at 363–64; *In re Glob. Crossing Sec. and ERISA Litig.*, 225 F.R.D. at 468). Class Counsel request reimbursement in the amount of $22,847.61 for expenses incurred while prosecuting this action.[10] (*See* Class Counsel Decl., ECF No. 67-2, ¶ 21; Fees Mem., ECF No. 67-1, at 15; Mediator's Invoice for First Day of Mediation, ECF No. 67-6; Mediator's Invoice for Second Day of Mediation, ECF No. 67-7.) The parties also estimated $432,592 in costs associated with Epiq's settlement administration, and, as of the May 15, 2025 Fairness Hearing, that estimate remained accurate. (Hr'g Tr., ECF No. 69, at 41:15–24.) As set forth above, the long form notice included information about these expected costs, and there has been no objection to the proposed settlement. (*See* Attach. 7 to Azari Decl., ECF No. 68-3, at ECF p. 55 (long form notice); Hr'g Tr., ECF No. 69, at 41:15–24, 20:1–5.)

Having reviewed counsel's declaration and the invoices of the mediator, and given the complexity of the settlement administration, the Court finds that the claimed costs were, on the whole, reasonably expended and that they should be paid for from the settlement fund. Accordingly, the Court respectfully recommends approving the request for an award of attorneys' expenses in the amount of $22,847.61, and the payment of settlement administration costs to Epiq in the amount of $432,592.

---

[10] The $22,847.61 in costs is comprised of: (1) $800 in filing and other court fees; (2) $72.61 in service of courtesy copies; and (3) $21,975 in mediation costs. (Class Counsel Decl., ECF No. 67-2, ¶ 27.)

3. *Plaintiffs' Awards*

"Incentive awards are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by plaintiffs." *In re Parking Heaters, Antitrust Litig.*, 2019 WL 8137325, at *8 (quotation marks omitted); *see also Hernandez v. Immortal Rise, Inc.*, 306 F.R.D. 91, 101 (E.D.N.Y. 2015) (same).

Here, the two named Plaintiffs seek an award of $5,000 each, totaling $10,000, in connection with their representation of the Settlement Class. (*See* Fees Mem., ECF No. 67-1, at 15.) Class Counsel submitted a declaration detailing the named Plaintiffs' efforts in this action over the past two years. (*See* Class Counsel Decl., ECF No. 67-2, at ¶¶ 15, 20.) The incentive awards requested in this case are in line with or are more modest than others that have been awarded in the Second Circuit. *See, e.g.*, *Lea*, 2021 WL 5578665, at *13 (awarding $7,500 to two lead plaintiffs); *Kindle v. Dejana*, 308 F. Supp. 3d 698, 718 (E.D.N.Y. 2018) (approving award of $10,000 to a named Plaintiff). Accordingly, the Court respectfully recommends approving the application for an incentive award of $5,000 to each Plaintiff.

## CONCLUSION

For the foregoing reasons, the Court respectfully recommends granting Plaintiffs' motions for final settlement approval (ECF No. 68) and for attorneys' fees, reimbursement of litigation expenses, and incentive awards to Plaintiffs (ECF No. 67).

\*    \*    \*    \*    \*

Objections to this Report and Recommendation must be filed, with a courtesy copy sent to the Honorable Eric N. Vitaliano, at 225 Cadman Plaza East, Brooklyn, New York 11201, within fourteen (14) days of filing. Failure to file objections within the

specified time waives the right to appeal both before the district court and appellate courts. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, e.g.*, *Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision" (quotation marks omitted)).

     **SO ORDERED.**

Dated:  Brooklyn, New York
       June 13, 2025

                                        _Taryn A. Merkl_
                                    TARYN A. MERKL
                                    UNITED STATES MAGISTRATE JUDGE